**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 28, 2022

**BY ECF**
The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

**Re: United States v. Judon McBride, 20 Cr. 363 (PKC)**

Dear Judge Castel:

The Government respectfully submits this letter in advance of sentencing in the above-captioned case, which is currently scheduled for April 5, 2022. For years, defendant Judon McBride has terrorized the Mott Haven neighborhood of the Bronx, his criminal history marked by heinous acts like the two shootings that led to his conviction before this Court. The statutory maximum sentence of 120 months' imprisonment is sufficient but not greater than necessary to reflect the gravity of McBride's conduct and otherwise serve the purposes of sentencing.

## I. The Offense Conduct

In the middle of the night on March 10, 2020, McBride, a convicted felon, left his apartment building holding a .380-caliber handgun. He walked across the street and fired eight rounds at two victims ("Victim-1" and "Victim-2") [redacted] striking Victim-2. Then he coolly continued down the block and fired three more rounds, hitting a daycare center. People nearby scattered, while McBride lifted his arms as if to ask, "What is anyone going to do about it?"

On the evening of the shootings, McBride and several others had been socializing in the area of Beekman Avenue and East 141st Street. (Government Exhibit ("GX") 63).




At some point, McBride got into an altercation with Victim-1 outside of 325 Beekman Avenue, demanding to know why Victim-1 was in front of "McBride's building," and swinging at Victim-1's face. (Exhibit A at 19, 35, 54).[1] Victim-2 eventually pulled Victim-1 away from McBride and led Victim-1 back to [redacted] 609 Oak Terrace.

Meanwhile, McBride continued to socialize with a group on the corner of Beekman Avenue and East 141st Street. (Presentence Investigation Report ("PSR") ¶ 12; GX 63; GX64). At about 2:15 a.m., McBride left the group and walked a short distance up Beekman Avenue to his apartment at [redacted] where he entered the lobby, and rode the elevator to his floor. A few minutes later, McBride rode back down to the lobby and met a friend waiting for him outside the elevator (the "Friend"). The pair began walking out of the lobby together, and as they were going up the short flight of steps leading to the street, the defendant dropped a silver handgun.

[1] "Exhibit," as opposed to "Government Exhibit," refers to evidence submitted as part of sentencing that was not part of the trial record.

The Friend quickly picked up the gun and passed it back to McBride. Together they continued onto the street in the direction of Oak Terrace. (GX 101-105; 112; Tr. 64-65).

About a minute later, at around 2:25 a.m., McBride fired eight rounds at Victim-1 and Victim-2, as they were outside [redacted] at 609 Oak Terrace.[2] One of McBride's bullets struck Victim-2 in the leg and lodged in his tibia, requiring surgery. (Exhibit A at 21, 27). After firing at Victim-1 and Victim-2, McBride calmly proceeded down Beekman Avenue where he opened fire again, this time striking a daycare, which was closed at that hour. (GX 106; Exhibit A at 30; Exhibit B).

As two police officers made their way to the victims at 609 Oak Terrace, they came across McBride walking away from the shootings. Familiar with McBride, one of the officers asked him what was going on. The defendant responded, "They're shooting over there, I'm out of here." (Tr. 95; GX 112). None the wiser, the officers continued to 609 Oak Terrace, arriving before Victim-2 was taken to a nearby hospital for his gunshot wound. Meanwhile, McBride went to the Friend's apartment on Cypress Avenue. There he changed his jacket and hat before returning to his own apartment on Beekman Avenue. (GX 53; GX54).

Members of the NYPD Evidence Collection Team recovered eleven bullet casings from the two scenes: eight outside 609 Oak Terrace and three outside 320 Beekman Avenue. (GX 43; Tr. 140; 190-191.)

## II. <u>Procedural History</u>

On May 18, 2020, the Government charged the defendant by complaint with one count of being a felon in possession of ammunition, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 2. He was arrested and detained two days later. On July 16, 2020, a Grand Jury sitting in the Southern District of New York returned an Indictment against McBride on the same charge.

The defendant was convicted at trial on April 29, 2021, of being a felon in possession of ammunition. Sentencing was originally scheduled for July 27, 2021. The Court has granted several defense requests for adjournments to accommodate, among other things, a change of counsel. (Dkt. 81).

## III. <u>The Guidelines Sentence</u>

In the PSR, the Probation Office calculated a Guidelines range of 210 to 262 months' imprisonment (the "Guidelines Range"), based on an offense level of 35 and Criminal History Category of III. (PSR ¶ 80.) The maximum term of imprisonment under 18 U.S.C. §922(g)(1), however, is 120 months. Because that statutory term is less than the Guidelines Range, the Guidelines term of imprisonment is the statutory maximum, *i.e.*, 120 months' imprisonment. (PSR ¶ 80).

---

[2] Victim-1 and Victim-2 initially claimed to have no knowledge of the shooter, but each eventually—and independently—identified McBride as the perpetrator who fired several rounds at them after an earlier altercation.

The Government agrees with the Probation Office's calculations, specifically a base offense level of 33, reflecting that the defendant possessed ammunition in connection with attempted first-degree murder (U.S.S.G § 2A2.1(a)(1)), as well as a two-level enhancement for the infliction of serious bodily injury (§ 2A2.1(b)(1)(B), § 1B1.1). (PSR ¶ ¶ 29-30).

The defendant objects to the Guidelines range calculated by the Probation Office on two grounds. First, the defendant argues that the cross reference to attempted murder in the first degree pursuant to U.S.S.G. § 2A2.1(a)(1) does not apply and that the applicable base offense level is 20, pursuant to U.S.S.G. § 2K2.1(a)(4). (McBride Sent'g Submission at 2-3). Second, he argues that a two-point enhancement for inflicting serious bodily injury on the victim is inappropriate. (*Id.* at 3-4). For the reasons discussed below, both the defendant's objections are meritless and may be answered without a *Fatico* hearing.

**A. Applicable Law**

Facts relied on at sentencing for the purpose of calculating the applicable Sentencing Guidelines must be established by a preponderance of the evidence. *United States v. Thorn*, 317 F.3d 107, 117 (2d Cir. 2003); *United States v. Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005). "[E]ven acquitted conduct may be treated as relevant for purposes of Guidelines calculations 'so long as that conduct has been proved by a preponderance of the evidence.'" *United States v. Jones*, 531 F.3d 163, 176 (2d Cir. 2008) (quoting *United States v. Watts*, 519 U.S. 148, 157 (1997)). Furthermore, "a sentencing court, like a jury, may base its fact-finding on circumstantial evidence and on reasonable inferences drawn therefrom." *United States v. Gaskin*, 364 F.3d 438, 464 (2d Cir. 2004).

As always, the "sentencing court is afforded broad discretion in resolving disputed factual issues." *United States v. Ambrosio*, 129 F.3d 114, 1997 WL 701368, at *2, n.1 (2d Cir. 1997) (summary order) (citing *United States v. Ibanez*, 924 F.2d 427, 430 (2d Cir. 1991)). Indeed, the sentencing court "is entitled to rely on any type of information known to it" in resolving sentencing disputes. *United States v. Tracy*, 12 F.3d 1186, 1203 (2d Cir. 1993) (citing *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989)).

At a sentencing hearing, the Federal Rules of Evidence do not apply, and the Court is not bound by rules governing hearsay, provided the basis for the court's determination has indicia of reliability and is not otherwise contrary to a defendant's due process rights. *See United States v. Fatico*, 579 F.2d 707, 711 (2d Cir. 1978); *see also United States v. Martinez*, 413 F.3d 239, 242 (2d Cir. 2005) ("Both the Supreme Court and this Court, however, have consistently held that the right of confrontation does not apply to the sentencing context and does not prohibit the consideration of hearsay testimony in sentencing proceedings."). Rather, "[a]ny information or circumstance shedding light on the defendant's background, history and behavior may properly be factored into the sentencing determination." *Carmona*, 873 F.2d at 574 (citing *Williams v. New York*, 337 U.S. 241, 250–51 (1949)).

**B. The Attempted First-Degree-Murder Cross-Reference is Appropriate**

Federal law defines murder as "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111. A "willful, deliberate, malicious, and premeditated killing," or a killing "perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree." *Id.* "Any other murder is murder in the second degree." *Id.*

Murder of either degree requires a specific intent to kill, which may be inferred from circumstantial evidence. *See United States v. Muyet*, 994 F. Supp. 501, 517 (S.D.N.Y. 1998). Courts frequently infer such an intent based on firing at a victim at close range. *See, e.g.*, *United States v. Atehortva*, 69 F.3d 679, 687 (2d Cir. 1995) (concluding that a district court could find intent to murder where there was "undisputed evidence that [the defendant] repeatedly fired a gun at federal agents from close range"); *United States v. Stroman*, 498 F. App'x 67, 69 (2d Cir. 2012) (affirming application of attempted second-degree murder guideline where surveillance video showed defendant pursuing two men into a grocery store and firing a gun at them at close range); *Muyet*, 994 F. Supp. at 518-19 (collecting New York state cases which outline intent to kill, including cases involving defendants who point and fire guns at their intended victims at close range); *United States v. Ashburn*, No. 11 Cr. 303 (NGG), 2015 WL 5098607, at *17 (E.D.N.Y. Aug. 31, 2015) (citing New York state cases which establish that "shooting a firearm at close range generally evidences the intent to kill, not seriously injure").

What sets first-degree murder apart are "premeditation" and "deliberation," terms difficult to define. *United States v. Mulder*, 273 F. 3d 91, 117 (2d Cir. 2001); *see also United States v. Cespedes*, 2015 WL 4597539 *3 (S.D.N.Y. July 30, 2015) (citing *United States v. Begay*, 673 F. 3d. 1038, 1042 (9th Cir. 2011)). Guided by other circuits, the Second Circuit has stated that deliberation "requires a 'cool mind' that is capable of reflection," and premeditation "requires that the one with the 'cool mind' did, in fact, reflect at least for a short period of time before his act of killing." *Mulder*, 273 F. 3d at 117 (quoting *United States v. Shaw*, 701 F.2d 367, 393 (5th Cir. 1983)). That period of time need not be days, hours, or even minutes. Rather, "it is the fact of deliberation, of second thought[,] that is important." *Cespedes*, 2015 WL 4597539 *3 (quoting *United States v. Catalan–Roman,* 585 F.3d 453, 474 (1st Cir.2009) (citation omitted) (alteration in original)).

Like specific intent to kill, premeditation may be inferred from circumstantial evidence. *Mulder*, 273 F.3d at 117; *see also Cespedes*, 2015 WL 4597539 at *3 (quoting *Begay,* 673 F.3d at 1043)). Specifically, three categories of evidence may be useful in finding premeditation: "(1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, *planning activity;* (2) facts about the defendant's prior relationship and conduct with the victim from which *motive* may be inferred; and (3) facts about the *nature of the killing* from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design." W. LaFave, 2 Substantive Criminal Law (3d ed.) § 14.7(a).

Possession of a murder weapon is probative of the first category of evidence, while "prior threats by the defendant to the victim," as well as "prior conduct of the victim known to have

angered the defendant" may help establish the second. *Id.* For example, in *United States v. White*, 17 Cr. 611, Judge Torres found that U.S.S.G. § 2A2.1 was appropriately applied where the evidence established that the defendant, after learning that an individual had threatened his friend, retrieved a gun and fired at that individual several times. (Sent'g Tr. at 6-7, Dkt. 646). As for the third category of evidence—the nature of the killing—courts have looked to the number of bullets fired and the perpetrator's demeanor leaving the scene. In *United States v. Rodriguez*, for example, the Second Circuit held that the application of U.S.S.G. § 2A2.1 was appropriate where surveillance video revealed that the perpetrator had fired multiple shots at close range before "calmly . . . leav[ing] the scene of the shooting." 738 Fed. Appx. 729, 720 (2d Cir. 2018); *see also Mulder*, 273 F.3d at 117 (application of § 2A2.1 proper where perpetrator threatened victim before his death and fired several bullets).

McBride fired eight bullets at 609 Oak Terrace. The jury's verdict established as much. Nevertheless the defendant maintains that "it was not clear from the evidence that the defendant, as opposed to someone he might have aided and abetted, fired the shot." (McBride Sent'g Submission at 3.) The defendant is incorrect. As noted above, the evidence at trial showed McBride, moments before the shooting, walking out of his lobby toward the direction of Oak Terrace. While exiting the lobby, McBride dropped a silver handgun, which the Friend returned to him. (GX105). Had the Friend been the shooter, it would have been illogical to return the gun to McBride only to take it back seconds later. Furthermore, about a minute after the Oak Terrace shooting, McBride is seen clearly on video firing the same gun that ejected the eight casings found outside 609 Oak Terrace. (GX 106, 112). The record evidence and the jury's verdict refute any suggestion that McBride may not have been the shooter at 609 Oak Terrace.

It is equally clear that McBride fired those eight bullets after a period of reflection, according to a premeditated plan to kill Victim-1. McBride's motive was plain: McBride and Victim-1 had been in an altercation earlier in the evening of the shooting. (Exhibit A at 19, 35, 54); *see also Mulder*, 273 F.3d at 117 (first-degree murder finding appropriate where perpetrator made earlier threats to kill). McBride also had ample time to deliberate. He left the corner of Beekman and 141st Street around 2:15 a.m. and did not fire at Victim-1 and Victim-2 until approximately 2:25 a.m. During that time, McBride traveled to his apartment and retrieved a murder weapon—the silver handgun that he dropped just before exiting the lobby of his building. (GX 101-105).

The number of bullets only emphasizes the deliberate nature of the shooting. *Mulder*, 273 F.3d at 117. McBride did not fire a single bullet as a warning shot or during a heated argument. He fired bullet after bullet at Victim-1 and Victim-2 as part of a preconceived plan, the moments between each trigger-pull offering an opportunity to reflect and stop shooting. The several bullets also dispel any doubt that McBride intended to *kill*, as opposed to wound or merely warn.[3]

Furthermore, McBride fired from close range, as evidenced by a frantic 911 caller from 609 Oak Terrace who reported, "They came and, I mean, they ran up here." About a minute later,

---

[3] This case thus stands apart from *United States v. Cespedes*, where Judge Engelmayer concluded that the defendant intended not to kill but to commit a non-fatal assault, focusing on the fact that the defendant had declined to retrieve a firearm stashed nearby. 2015 WL 4597539 at *5.

another speaker in the background can be heard exclaiming, "unbelievable, I saw the guy just shoot him." (Exhibit C at 1:09 and 2:13).[4] The location of the bullet casings—scattered on the sidewalk just a few feet from the entrance to 609 Oak Terrace—confirms that range. (GX 32, GX 40, GX 41). At trial, Special Agent Howard Stern of the Bureau of Alcohol Tobacco and Firearms stated that an expended shell casing typically will land "pretty close to the shooter . . . either right next to him, perhaps a few feet." (Tr. 156).

Finally, McBride's cool demeanor as he walked away from 609 Oak Terrace establishes that he "acted deliberately and with the specific intent to kill." *Rodriguez*, 738 F. App'x at 738. Here, as in *Rodriguez*, video reveals McBride "bring a firearm to the scene," fire several "shots at close range," and then "appearing calmly to leave the scene of the shooting." *Id.* (GX 101-106; 112).[5]

### C. The Enhancement for Bodily Injury is Appropriate

There is also no dispute that McBride caused Victim-2 to suffer serious bodily injury. Section 1B1.1 of the Sentencing Guidelines defines "serious bodily injury" as an injury "involving extreme physical pain or . . . requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." (Application Note M). Focusing solely on the statute of conviction, the defendant maintains that his was a victimless crime. (McBride Sent'g Submission 4). But that altogether ignores relevant conduct that the Sentencing Guidelines are designed to reflect and sentencing courts may of course consider. Here, the evidence is clear that defendant possessed several rounds of ammunition in connection with the attempted murder of Victim-1. That conduct left Victim-2 with a bullet lodged in his shin, an injury that required surgery and thus qualifies as serious bodily injury under the plain meaning of § 1B1.1. (Exhibit A at 21, 27).

## IV. <u>The Appropriate Sentence</u>

### A. Applicable Law

While advisory following *United States v. Booker*, 543 U.S. 220 (2005), the Guidelines remain "the starting point and the initial benchmark" for sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007). That is because the Guidelines are "the product of careful study based on

---

[4] A next-door neighbor reported hearing someone outside yelling "why would *he* do that," further evidence that the shooter was at close enough range to be recognized as male in the middle of the night (Exhibit A at 29) (emphasis added).

[5] The suggestion that McBride may have been acting out of self-defense is groundless. (McBride Sent'g Submission at 3). To begin, the trial record was clear that responding officers recovered eight shell casings from the area outside 609 Oak Terrace, all of which were fired from the same gun. (Tr. 189). Had the victims been firing at McBride, officers presumably would have recovered bullets from another firearm. It was also clear that the defendant was not being pursued or attacked in the moments before the shooting. Rather, taking his time, McBride retrieved a firearm from his apartment and traveled *to* his victims. (GX 101-105). In other words, he sought them out. Nor did McBride flee 609 Oak Terrace after firing several shots, as one might expect if the defendant had felt threatened or attacked. (GX 112; GX 106).

extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id.* at 46. For that reason, "in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006).

In imposing a sentence, the Court must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)–(7). *See Gall,* 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant;
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

**B. The Statutory Maximum Sentence is Appropriate and Not Greater Than Necessary**

A sentence of 120 months is necessary to provide just punishment for McBride's egregious conduct in this case. It is also necessary to account for the similarly heinous acts that characterize his criminal history, to protect the public from future crimes of the defendant, and to deter the defendant from criminal conduct.

Angry that Victim-1 was standing in front of "his" building on Beekman Avenue, McBride responded by spraying bullets at Victim-1 and Victim-2 in the entrance [redacted] at 609 Oak Terrace. Aiming to kill Victim-1, McBride instead struck Victim-2, breaking Victim-2's shinbone and lodging a bullet there. As he fired over and over again, McBride had no regard for the other tenants of 609 Oak Terrace. (Exhibit A at 52). Much less did he care for the next-door neighbors, including a family [redacted] whose front door he shot through while children slept upstairs. (*Id.* at 29.) Making matters worse, McBride's spree continued after 609 Oak Terrace. Emboldened, he sauntered down Beekman Avenue and fired three more rounds, striking a daycare and causing people nearby to flee. (GX 106; Exhibit A at 30; Exhibit B). McBride then had the audacity to stop for two responding officers, reporting to them that *other* people were "shooting over there" and he was looking to get away. (Tr. 95; GX 112). In a word, McBride's crime was stunning. It was stunning in how senseless, how dangerous, how violent, and how audacious it was. A sentence of 120 months is necessary to justly punish his conduct.

The statutory maximum sentence is also appropriate to reflect the defendant's violent criminal history. In 1993, McBride was arrested for raping a woman after following her home and forcing his way into her apartment. (PSR ¶ 39). Within just a few days of that arrest, he was arrested yet again for manslaughter and criminal weapon possession after he shot and killed a victim. (PSR ¶ 40). For those crimes McBride was sentenced to five to fifteen years' imprisonment and 100 months to 25 years' imprisonment, respectively.

Yet the criminal history calculated in the PSR grossly understates the extent of the defendant's criminal conduct. Video footage from September 3, 2016, reveals McBride getting into an argument with an individual and viciously pistol whipping that person a short time later. That attack occurred just across the street from where McBride shot at Victim-1 and Victim-2 (Exhibit D, E). McBride is also suspected of shooting two victims four days later, on September 7, 2016, just outside 340 Beekman Avenue (Exhibit F, G, H).[6]

Finally, a sentence of 120 months is necessary to protect the public from McBride and to deter criminal conduct. The defendant has a long record of violent crime, spanning decades. Repeatedly and with what must seem like impunity, the defendant has menaced the people of Mott Haven. He has shot them, beaten them, and berated them. He has left bullet holes in bedroom windows and daycare centers. And unlike other individuals, the defendant has not aged out of crime. Rather, in his mid-forties, he shot and injured Victim-2. A significant sentence would provide a much-needed reprieve from McBride's violence and, with hope, deter McBride from future violent crimes. At minimum it would communicate to others in Mott Haven that neighborhood violence will be met with a significant term of incarceration.

[6] Police reports from that incident indicate that both victims were entirely uncooperative in identifying the shooter.

## V. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose the statutory maximum sentence of 120 months' imprisonment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: ______________________
Marguerite B. Colson
Assistant United States Attorney
(212) 637-5287

cc: Thomas H. Nooter, Esq. (ECF)